## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

NATHANIEL LUCAS,                    )
          Plaintiff,              )
                          )
       v.                              )         CAUSE NO.: 2:13-CV-44-PRC
                          )
CAROLYN W. COLVIN,                  )
Acting Commissioner of the         )
Social Security Administration,    )
         Defendant.             )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Nathaniel Lucas on

January 29, 2013, and a Plaintiff's Memorandum in Support of His Motion for Summary Judgment

[DE 16], filed by Plaintiff on July 19, 2013. Plaintiff requests that the September 2, 2011 decision

of the Administrative Law Judge denying his claim for supplemental security income ("SSI") be

reversed and remanded for further proceedings. On September 23, 2013, the Commissioner filed a

response, and Plaintiff filed a reply on October 23, 2013. For the following reasons, the Court grants

Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On March 30, 2010, Plaintiff filed an application for SSI, alleging an onset date of May 1,

2001, for disability due to anxiety, psychosis, personality disorder, seizure disorder, degenerative

disc disease, gastroesophageal reflux disease, and knee arthritis. The application was denied at the

administrative level, and Plaintiff requested a hearing, which was held on June 27, 2011, before

Administrative Law Judge ("ALJ") Edward P. Studzinski. In appearance were Plaintiff, his attorney

Velda Desari, and vocational expert ("VE") Lee O. Knutson. The ALJ issued a written decision

denying benefits on September 2, 2011, making the following findings:

1. The claimant has not engaged in substantial gainful activity since March 30, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: degenerative disk[sic] disease, arthritis in his knees, seizure disorder, personality disorder, anxiety, and psychosis (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than light work as defined in 20 CFR 416.967(b). Specifically, the claimant can lift twenty pounds occasionally and ten pounds frequently. The claimant can sit for six hours and stand and/or walk for six hours for a total of eight hours in a standard workday. The claimant is limited in his ability to use his lower extremities to operate foot controls. The claimant can never climb ladders, ropes, and scaffolds, but can occasionally balance, stoop, kneel, crouch, or crawl. The claimant must avoid concentrated exposure to extreme heat and cold as well as humidity. The claimant must avoid hazardous work environments. The claimant is limited to simple, routine, repetitive tasks. The claimant is limited to simple and concrete decision making. The claimant's work must involve limited changes in the work setting in terms of place, procedures, and products. The claimant can have no interaction with the general public and very limited interaction with coworkers and supervisors, and cannot perform tandem tasks. The claimant needs to use a cane for ambulation and will need to alternate between sitting and standing at will, but will not spend more than one minute of every twenty minutes in the workday shifting position and will remain on task when he is shifting position.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born [in 1965] and was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 FR 416.964).

8. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 416.968).

9.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since March 30, 2010, the date the application was filed (20 CFR 416.920(g)).

(AR 12-22).

On November 26, 2012, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On January 20, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Evidence

*1.     Records Prior to Plaintiff's Release from the Indiana Department of Corrections*

a.     Physical Health

At the Indiana Department of Corrections, on January 31, 2007, Perry Dobyns, M.D. noted that Plaintiff was "very argumentative and abusive" when told to complete a form for evaluation of his knee and arthritis [back] pain. (AR 272). Plaintiff was diagnosed with possible sacroilitis of the lower spine and osteoclastic reaction in the right elbow. The x-ray of the elbow showed slight

hypertrophic spurring from the olecranon process. Lumbar spine films showed degenerative and hypertrophic changes at L4 with more severe changes at L5-S1.

The January 31, 2007 treatment notes indicate chronic esophageal reflux and osteoarthritis and that Plaintiff complained of chronic pain from his knee injury and arthritis. The doctor noted that there was no formal evaluation or documentation. When Plaintiff was told to complete the health care form in order to start an evaluation, Plaintiff was combative and abusive.

On February 15, 2007, the treatment record notes that Plaintiff had joint pain and chronic osteoarthritis. On April 19, 2007, Plaintiff requested treatment for joint pain (back and knee) and for GERD. The treatment notes report chronic osteoarthritis and allied disorders. On May 4, 2007, the treatment notes show that Plaintiff had chronic esophageal reflux, osteoarthritis, and allied disorders. The doctor noted that Plaintiff had severe arthritis in his back and knee joints that was exacerbated with inclement weather. The doctor ordered a bottom bunk pass for ninety days and a lower back brace. On July 26, 2007, Diane Elrod, D.O. wrote that Plaintiff was doing much better walking and that Plaintiff did not need crutches but requested a cane. Dr. Elrod ordered a cane and a bottom bunk. On September 1, 2007, Plaintiff had a follow up visit for his arthritis. He reported that he was still hurting but felt better after prednisone.

On July 22, 2008, the doctor wrote that Plaintiff's "biggest problem is the arthritis in his knees." (AR 282). Plaintiff requested a new left knee brace because his brace had worn out. On August 13, 2008, and September 22, 2008, it was noted that Plaintiff was taking Naprosyn. Plaintiff requested more pain medication but the doctor declined the request because of concerns with Plaintiff's kidney function. On September 22, 2008, it was noted that Plaintiff had been on Naprosyn

for his arthritis but was being switched to Tylenol because of the effects of the NSAID. On October 13, 2008, Plaintiff complained of continuous arthritic pain in both hands and his left hip.

On February 3, 2009, Plaintiff reported left knee pain with chronic intermittent swelling. He reported that he had surgery on the left knee. On May 5, 2009, Plaintiff reported chronic swelling of and pain in the left knee. Plaintiff reported multiple injuries to his knee. It was noted that he had chronic osteoarthritis and allied disorders. On September 10, 2009, it was noted that Plaintiff suffered from chronic osteoarthritis and allied disorders. On November 24, 2009, Plaintiff reported that repetitive hand use during work release caused pain and swelling in his arms and hands.

Plaintiff was taking Lorazepam, Meloxicam, Omeprazole, Risperdone, Gabapentin, Salsalate, Diclofenac, and Xanax. The medical records show that he is allergic to Dilantin with the side effect of diarrhea.

b.    Mental Health

On July 15, 2009, while in prison, Plaintiff requested an appointment with a counselor for complaints of paranoia, depression, and anxiety. He reported that he felt nervous and "antsy" around lots of people and felt like someone was "out to get" him. (AR 297). He said he always felt depressed. He reported that he served in the army for four years with a dishonorable discharge and experienced noise and biohazard exposure. He reported a history of homicidal and suicidal thoughts. He was the victim of physical and sexual child abuse at the hands of his foster parents. He was convicted of armed robbery and was incarcerated through April 18, 2010. He "isolated" when depressed, and could become physically aggressive when angry. He had a history of head injury. On mental status examination, Plaintiff exhibited excessive speech, anxious mood, and only "fair" reasoning. Plaintiff reported that he murdered his sister's boyfriend when he was thirteen years old

but that he was never charged. He had three sons who were all dead, by shooting or drowning. He was in special education classes each year until he quit school in the ninth grade. He had a history of behavioral problems throughout school and of sleeping only two hours a night. Plaintiff reported that he had deliberately driven his car into a tree on several occasions to attempt suicide. He also tried to kill himself by walking in traffic with his eyes closed.

At his second session on July 22, 2009, Plaintiff was diagnosed with anxiety for "excessive and persistent daily worry about several life circumstances that has no factual or logical basis." (AR 256). On examination, hyperactive psychomotor behaviors were noted, along with excessive speech, and only "fair" reasoning, impulse control, and insight. His self-perception was aggrandizing, and his thought process was circumstantial. He was observed acting defiantly toward prison staff upon arriving for the appointment, refusing to use the door designated for inmates and insisting on using the visitation room entrance. He presented himself as superior to both other inmates and staff. He reported having been in six fights since arriving in minimum security without being caught and expressed anger at two staff members whom he felt were "out to get him." He felt anxious when they were on duty. He reported mood swings. He did not meet the criteria for an Axis I diagnoses of anxiety or depression. He did not mention hallucinations.

2.    *Medical History Following Plaintiff's Release from Prison*

On May 26, 2010, Irena Walters, Psy.D. performed a consultative mental examination. Plaintiff reported poor concentration because of attention deficit disorder and that he hates men. He self reported that he was taking Dilantin. He stated that for the last twenty years, a ghost named "Reggie" followed him around. He admitted to tearfulness on a weekly basis. He had mood swings and slept only two hours a night. He became dizzy and sweaty around crowds and wanted to run.

His mood was anxious; his affect was angry and irritable. He did not know the number of weeks in a year, where London is located, the capital of Italy, the author of Romeo & Juliet, the four seasons of the year, the direction in which the sun sets, the number of ounces to a pound, or a current event. He could not do simple math, or count down from 20; he became frustrated. He put forth good effort during his evaluation. Dr. Walters diagnosed anxiety disorder, psychosis, and antisocial personality disorder and assigned him a GAF score of 50-55.

On June 11, 2010, J. Smejkal, M.D. evaluated Plaintiff, noting a history of seizures (the most recent having occurred the previous week), anxiety, paranoia, GERD, and arthritis. On physical examination, Plaintiff was observed "talking to someone who was not there." (AR 347). Plaintiff had "abnormal mood, affect, insight, and judgment." (AR 349). Plaintiff wore a back brace, and his lumbar range of motion was abnormal. Plaintiff had a normal gait, was able to walk heel to toe with no difficulty, got on and off the examination table with no problem, could move from standing to sitting with no difficulty, and had a normal spine. He was unable to stoop and squat. He had tenderness of the lumbar region of the spine with restricted range of motion and negative straight leg raises. He had normal upper extremities and had full range of motion in his lower extremities. Dr. Smejkal listed Dilantin as a medication and listed no allergies. He noted a history of seizures since 2006.

From May 2010 through July 2011, Plaintiff treated at the VA Hospital. On June 8, 2010, primary care provider Dr. Hayssam Kadah treated Plaintiff for depression, GERD, siezures, and chronic pain due to narrowed lumbar disc space and osteoarthritis seen on June 2010 x-rays. At the initial evaluation, Dr. Kadah referred Plaintiff to specialists for counseling, due to depression and chronic post traumatic stress disorder. A PHQ-9 screening test for depression was positive, as was

a PTSD 4Q screening test. On June 8, 2010, Dr. Kadah observed that Plaintiff "went straight to the examination table on account of pain" but was able to stand, sit, and walk "without undue difficulty" as the examination proceeded. (AR 376-79, 735-38).

On July 14, 2010, Benetta Johnson, Ph.D. completed a Psychiatric Review Technique form, indicating that Plaintiff suffered from psychosis disorder, anxiety disorder, and antisocial personality disorder. She opined that Plaintiff suffered moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace and suffered mild restrictions of activities of daily living. Dr. Johnson also completed a Mental Residual Functional Capacity Assessment form, indicating moderate limitations in Plaintiff's ability to (1) understand and remember detailed instructions, (2) carry out detailed instructions, (3) maintain attention and concentration for extended periods, (4) work in proximity to others without being distracted; (5) interact with the public appropriately; and (6) get along with co-workers.

At a July 15, 2010 psychotherapy session, Plaintiff presented with complaints of isolation, poor sleep, and hallucinations. Plaintiff did not think the hallucinations were abnormal. His therapist "reframed" his experiences of seeing and talking with a dead person as a "symptom." Plaintiff did not like when others walked behind him. He reported killing several men and having experienced suicidal thoughts. He frequently felt helpless, down, nervous, and anxious and had little interest several days a week. "Reggie" talked to him and frequently was seen by Plaintiff. Plaintiff stayed away from people due to anger and agitation. The notes indicate psychomotor agitation, angry affect and mood, limited insight, and fair judgment. Plaintiff was assigned a GAF score of 49.

On July 16, 2010, M. Brill, M.D. issued a Physical Residual Functional Capacity report, limiting Plaintiff to light work and indicating that Plaintiff is only occasionally able to climb stairs

and to balance, stoop, kneel, crouch or crawl and never able to climb ropes or ladders. Dr. Brill placed a limitation of avoiding all exposure to hazards (machinery, heights, etc.), due to seizure disorder, knee pain, and lumbar pain.

On August 17, 2010, Plaintiff was diagnosed with insomnia. He had difficulty maintaining sleep and was anxious. Psychiatrist Dr. Zhang observed muscle tension and easy fatigue. Ativan was started. On August 20, 2010, Dr. Kadah prescribed a back brace because the abdominal binder for chronic back pain did not provide enough support. Dr. Kadah noted that Plaintiff ambulated without an assistive device.

On September 13, 2010, Drs. Jack Yen and Constance Phillips noted Plaintiff's lack of trust and his desire to avoid other men. The report notes nightmares about childhood abuse; decreased concentration, memory, and appetite; irritability; and anger outbursts. Plaintiff was anxious and felt hopeless. His girlfriend confirmed his paranoia, need for "symmetry," and intermittent sleep pattern. Plaintiff reported that "Reggie" was following him; his girlfriend confirmed his visual hallucinations. Plaintiff was observed trying to "straighten" the interview room. (AR 713). On examination, his affect was labile, his motor activity was agitated, and his insight, judgment, and impulse control were poor. He had both suicidal and homicidal ideation. He was assessed with "PTSD chronic neurosis from childhood trauma;" "rule out" obsessive compulsive disorder (OCD), psychosis, depressive disorder with psychotic features; antisocial traits; and cocaine dependence in full sustained remission. Risperdone was started. Plaintiff was given a GAF score of 43.

October 27, 2010 left hand x-rays showed prior partial amputation of the fourth finger and mild degenerative joint disease of the distal interphalangeal joint of the left fourth finger. Bone fragments from prior trauma were noted in the right hand. No significant osteoarthritis was noted.

Degenerative changes (spurring) were seen on right knee x-ray. X-rays ordered by Dr. Kadah showed narrowing of the left knee joint and osteoarthritis (patellar spurring). On October 27, 2010, Plaintiff was issued two knee braces and a back brace.

A November 18, 2010 lumbar MRI showed degenerative disc disease with protrusions and bilateral foraminal stenosis at L3-4, L4-5, and L5-S1.

On January 10, 2011, Plaintiff's girlfriend reported that he slept intermittently. Plaintiff reported decreased concentration and irritability; he still avoided concentrations of people. On examination, agitated motor activity was noted; his affect was labile, with poor insight, judgment, and impulse control. His Risperdone dosage was increased.

On February 11, 2011, Plaintiff was seen at the pain clinic for low back pain radiating to his legs and feet. He was treated with a lumbar epidural steroid injection, which provided minimal relief. A TENS unit was considered.

On March 7, 2011, Plaintiff presented to be evaluated for a cane. He was issued a wood cane and given gait training. He reported that he had surgery on his left knee in 1983 and surgery in 2000 from gunshots to both legs below the knee and right forearm. He reported that the lumbar epidural steroid injection at the pain clinic did not help. A left knee examination revealed soft tissue swelling with limited flexion. He was noted to have a steady gait.

On March 11, 2011, Plaintiff had physical therapy for lumbar dysfunction. His provider confirmed that he required an assistive device for ambulation and issued a cane because Plaintiff had lost his when his car window was open. Plaintiff's pain affected his sleep, and pain medication was required. His standing balance was only fair. Plaintiff was observed wearing a left knee brace, had a surgical scar on his knee, and walked with an antalgic gait. His posture was abnormal with his

weight shifted to the right and his back muscles tight. His physical exam revealed tightness in the quads and hamstrings, poor muscle performance of the left knee extensors and flexors, and contracture tightness of the left knee joint, which can cause lumbosacral dysfunction.

On March 14, 2011, Dr. Yen noted that Plaintiff was irritable and that he was not taking Risperidone correctly. Plaintiff reported irritability, anger, decreased concentration, and nightmares.

On March 18, 2011, Plaintiff saw Paulette Stronczek, Ph.D. Plaintiff was not comfortable attending therapy without his girlfriend present. He reported wanting to hit men. He had conversations with people "no one else can see," who told him to do bad things. Dr. Stronczek observed that Plaintiff appeared restless and used his walking cane to express his feelings, swinging it during the therapy session. Post traumatic stress disorder and psychotic disorder were diagnosed.

On April 8, 2011, Plaintiff reported receiving no relief from his current pain medication and was ambulating with a cane. Associated pain symptoms included inability to perform activities of daily living, concentrate, and anxiety.

On April 25, 2011, Dr. Yen noted irritability, outbursts of anger, and isolation. Dr. Yen noted that Plaintiff was taking his 20mg Citalopram daily, but incorrectly. His mood worsened with the medication. He continued to be distractible and picked papers out of the trash can during treatment. He still had nightmares of childhood abuse and decreased concentration, interest, and appetite. Plaintiff was anxious and hopeless. He denied hallucinations but still saw his dead friend. He was paranoid and concerned with the level of organization in his provider's office. His active outpatient medications were listed as Citalopram, Gabapentin, Guaifenesin, Omeprazole, Dilantin, Pyridoxine, Risperidone, and Tramadol. He walked with a cane. On mental status examination, agitated motor activity was noted, his affect was labile, and his insight, judgment, and impulse control were poor.

Given the "possible decrease in seizure threshold [due to] drugs like Risperidone," Plaintiff's medication dosage was changed. Dr. Yen also suggested that Plaintiff start taking Depakote as a mood stabilizer, but Plaintiff declined because he does not like needles. Citalopram was discontinued, since it worsened his mood.

In an April 27, 2011 psychotherapy progress note, Dr. Stronczek noted that Plaintiff had recently beat up his sister's boyfriend. Plaintiff had no remorse and was unable to understand potential consequences for his behavior. He reported chasing down motorists who looked at him, "unable to comprehend consequences." (AR 794). Plaintiff was hyperactive and continued to have visual and auditory hallucinations. He insisted that his girlfriend "knew" these people were present. The session ended when Plaintiff needed to get up and walk due to back pain. Dr. Strongczek noted: "Therapy may not be very effective, as patient's judgment is very poor. He seems to be functioning because he mostly stays at home and girlfriend cares for him." *Id*.

On June 15, 2011, Plaintiff was discharged from pain management because his "condition is stable" and his "pain management has been optimized." (AR 890).

On June 15, 2011, neurologist Jiang, M.D. felt that Plaintiff's seizures were suggestive of temporal lobe epilepsy. Plaintiff reported that his seizures began in 2007; his girlfriend reported that he was unaware of his surroundings when the seizures occurred, which was about twice a month. Plaintiff described the seizures as beginning with a strange taste in his mouth, with both sides of his body locking up and his eyes blinking. He reported that he started taking Dilantin in prison. He had had multiple head injuries. A brain MRI was ordered, and he was restricted from driving until he was free of seizures for at least six months. On physical examination, Dr. Jiang noted reduced

vibration sensitivity in the toes bilaterally and reduced sensation in the lower legs. Plaintiff's gait was observed to be antalgic, with a cane.

On June 20, 2011, Dr. Cosio, a clinical psychologist, noted that Plaintiff missed a scheduled initial assessment in the "JB/Pain Individual Psychotherapy Clinic." He noted that Plaintiff's mental health records showed that, at intake, his assessment indicated that he may require a higher level of monitoring when prescribed opioid drugs.

## B. Plaintiff's Testimony

Early in the hearing, Plaintiff was standing and leaning on his cane. He asked to lie on the floor to relieve his back pain, which the ALJ initially refused but then allowed later in the hearing. The ALJ described Plaintiff as sitting in a semi-reclining position. Plaintiff wore knee braces to the hearing and walked with a cane. Plaintiff requested permission to use the bathroom during the hearing due to problems with diarrhea.

Plaintiff completed the eighth grade in school and last worked in 2009.

Plaintiff testified that he was unable to work due to back pain. He stated that he could lift five to ten pounds and needed help rising from the toilet. He can stand for ten minutes if he is leaning on something and can sit for thirty seconds without pain. He estimated that he could walk less than fifty yards. He did not walk around his house without a cane. He spent his days lying on the living room floor; sleeping in a bed hurt his back.

Plaintiff testified that his medication did not effectively control his pain and that it had been recently increased. He testified that he needed to lie down six or seven times a day for five to ten minutes. The ALJ noted from the prison records that Plaintiff was given a bottom bunk, back brace,

and cane in prison. Plaintiff's attorney stated that Plaintiff reported having a long history of seeing ghosts. Plaintiff testified that, while in prison, he was lucky to a see a doctor every six months.

Plaintiff testified that he started experiencing seizures in 2007. He testified that he has seizures twice a week, on average, and that the seizures last five to ten minutes, during which his body locks up, his eyes roll back, and he "blacks out." (AR 57). It takes Plaintiff half an hour to become coherent following a seizure. Occasionally he loses control of his bowels or bladder during a seizure. He testified that he does not go to the hospital after seizures because he "can't stand the freaking people looking at me and touch me." (AR 58). He was compliant with his medical regimen, unless his stomach was "so messed up" he could not tolerate the medication. (AR 58). Plaintiff reported on the May 7, 2010 Adult Disability Report Form that he had about nine seizures during the first two months after his release from prison on March 1, 2010, stating that his last seizure had been one week earlier.

Plaintiff began hearing voices while he was in prison attributed to "Leroy [and] Reggie." "Reggie," who died thirty years earlier, told him not to kill people. Plaintiff could not stand people, and did not "go around" them. (AR 61). "Leroy" made him "beat up" people Plaintiff does not like. The week prior to the hearing, Plaintiff attempted to hit the mailman with his cane for asking a stupid question. He also assaulted his sister's boyfriend. His girlfriend did not allow him to accompany her to the grocery store because he would "always get into it" with people. (AR 61). Plaintiff had bars on his doors and windows at home so that he did not have to worry about people coming in to talk to him. It was his "own personal prison cell." (AR 68). In a May 18, 2010 Adult Function Report, Plaintiff reported that, if he went out, he was accompanied by his sister or girlfriend because he did not like people, hates men, and "don't trust nobody." (AR 190).

Plaintiff hates telephones. He doesn't like people telling him what to do and has a very short attention span when following spoken instructions. He reported that he does not sleep well, sleeping only three hours at night because he thinks someone is watching him. His sister color codes his clothes, and his girlfriend shaves him.

### C. Written Statement of Witness C. Pokropinski

On May 6, 2010, Social Security Administration interviewer C. Pokropinski conducted a face-to-face interview with Plaintiff. She observed that he had difficulty with concentrating and talking and that he talked a lot about ghosts in his sister's house.

### D. Report of Contact with Loretta Gunn

On October 5, 2010, witness C. Mathews interviewed Loretta Gunn, Plaintiff's sister. She reported that Plaintiff lives with family. Sometimes, he needs to be by himself in his room. He has no friends. Sometimes he yells at his sister's boyfriend or walks out of the room when angry. He spends minimal time in stores, does not talk to neighbors, and keeps to himself. He likes things done his way.

### E. Written Statement of Loretta Gunn

Ms. Gunn wrote that Plaintiff cannot sleep and walks through the house at night. He thinks someone is going to get him in his sleep. She reported that Plaintiff forgets things, does not prepare his own meals, becomes angry if someone tells him what to do, does not do house or yard work, becomes frustrated and irritated, does not spend time with other people, has a short attention span, and does not go out alone. She wrote that Plaintiff has problems getting along with family, friends, neighbors, and others, due to his "bad attitude," that Plaintiff stays away from authority figures, and that Plaintiff cannot handle stress.

She reported that Plaintiff cannot drive due to road rage and seizures. She stated that, if Plaintiff goes to the store, he is not there long because he cannot stand being around people. Plaintiff cannot pay bills and does not know how to use a checkbook or savings account.

She stated that Plaintiff has a bad back. He has problems with lifting, squatting, bending, sitting, talking, understanding, concentrating and completing tasks, memory, and following instructions. He cannot go to sleep. He uses a knee and back brace, which he was given while in prison, and that he uses them while walking.

Ms. Gunn supplemented her statement to say that Plaintiff was very angry and wanted to fight. She also reported that his seizures increased in frequency.

### F. Vocational Expert Testimony

Vocational expert Knutson testified that a hypothetical worker who needed to use a cane was limited to sedentary work because he could not perform the [two-handed] tasks required by light work. Generally speaking, jobs that do not require interaction with the public are "production jobs" that require the use of both hands. (AR 76). Sedentary work that does not require public contact includes grind machine operators, packers, and bench assemblers.

An individual who needs to change positions "at will," with those other restrictions, would not be employable.

If the hypothetical individual needs to stand for a couple minutes each hour, job availability would not be negatively impacted.

An individual who needs to stand every 20 minutes, for only one minute, but who could maintain concentration and attention to his task, would be employable, but in a number of available jobs reduced by thirty percent.

If the individual needs to stand more often, the individual could not focus on the job and would be unemployable.

An individual incapable of being focused ninety percent of the time would not be able to sustain employment.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*,

381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous

work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R. § 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [his] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of

proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal and remand of the ALJ's finding of not disabled on the basis that (1) the ALJ improperly determined Plaintiff's RFC; (2) the ALJ failed to properly assess the opinions of treating physician Dr. Kadah and the state agency consulting physicians; and (3) the ALJ improperly evaluated Plaintiff's credibility. The Commissioner responds that the ALJ's credibility and RFC determinations are supported by substantial evidence. The Court considers each argument in turn.

### A. Residual Functional Capacity

The RFC is a measure of what an individual can do despite the limitations imposed by his impairments. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004); 20 C.F.R. § 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. 20 C.F.R. § 416.927(e)(2); *Diaz*, 55 F.3d at 306 n.2. The RFC is an issue at steps four and five of the sequential evaluation process. SSR 96-8p, 1996 WL 374184, *3 (July 2, 1996). The ALJ's RFC finding must be supported by substantial evidence. *Clifford*, 227 F.3d at 870.

"The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, at *3. The relevant evidence includes medical history; medical signs and laboratory findings; the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment; evidence from attempts to work; need for a structured living environment; and work evaluations, if available. *Id.* at *5. In arriving at an RFC, the ALJ "must consider all allegations of physical and mental

limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC." *Id*. In addition, he "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe'" because they "may–when considered with limitations or restrictions due to other impairments–be critical to the outcome of a claim." *Id*.

1.     *At-will Sit/Stand Option*

The relevant section of the RFC at issue provides that Plaintiff "needs to use a cane for ambulation and will need to alternate between sitting and standing at will, but will not spend more than one minute of every twenty minutes in the workday shifting position and will remain on task when he is shifting position." (AR 16). Remand is required because the inclusion of an at-will sit/stand option is, on its face, internally inconsistent with the limitation that Plaintiff will spend no more than one minute of every twenty minutes shifting position. In addition, the testimony of the vocational expert suggests that no jobs would be available with the given RFC. Although the Commissioner acknowledges this argument by Plaintiff, the Commissioner offers no substantive response.

First, the ALJ does not explain how Plaintiff can be permitted to alternate between sitting and standing "at will" and at the same time be limited to changing position for only one minute every twenty minutes. When an ALJ includes an option for the claimant to switch between sitting and standing "at will," the ALJ limits the possible employment opportunities for the individual to those in which he can switch between sitting and standing "as frequently as he chooses." *Lopez v. Astrue*, No. 10 CV 08024, 2012 WL 1030481, at *10 (N.D. Ill. Mar. 27, 2012) (noting that "[a] sit/stand option at will is frequently used in the Seventh Circuit, demonstrating that an 'at will'

option is a sufficient specification of frequency of the individual's need" (citing *Zblewski v. Astrue*, 302 F. App'x 488, 492 (7th Cir. 2008); *Books v. Chater*, 91 F.3d 972, 976 (7th Cir. 1996); *Schneeberg v. Astrue*, 669 F. Supp. 2d 946, 949 (W.D. Wis. 2009)). If the ALJ meant to only allow Plaintiff to change position for one minute every twenty minutes, then the ALJ should have left out the option for Plaintiff to change positions "at will." The inclusion of both creates an apparent internal inconsistency within the RFC.

Moreover, the vocational expert testified that the need to change positions only a couple of minutes each hour would have a minimal impact on the number of possible jobs and that the need to change position one minute out of every twenty minutes would reduce the numbers of jobs he had identified by approximately thirty percent. The vocational expert further testified that if the individual needed to change positions *more* frequently than for one minute every twenty minutes or if he were off task when changing positions, the individual would be unemployable. Thus, if Plaintiff needs to be able to change positions at will at a greater rate than for one minute every twenty minutes or, if he is off task while changing positions every twenty minutes, he would be unemployable.

This internal inconsistency, especially in light of the vocational expert's testimony, requires remand for reconsideration because the Court cannot trace the path of the ALJ's reasoning. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (finding that the ALJ failed to identify any medical evidence to substantiate her belief that the claimant was able to meet certain physical requirements); *Briscoe*, 425 F.3d at 352 (finding that the ALJ did not explain how he arrived at the exertional limitations in the RFC and that no record evidence supported the RFC); *Nelson v. Astrue*, No. 10-cv-3268, 2013 WL 869957, at *9 (C.D. Ill. Jan. 25, 2013) (reversing the ALJ's decision, in part,

because the RFC findings were internally inconsistent); *Myles v. Astrue*, No. 11 C 4795, 2012 WL 3961221, at \*13 (N.D. Ill. Sept. 4, 2012) (finding that aspects of the ALJ's decision concerning the plaintiff's obesity were internally inconsistent).

Second, even if the ALJ meant to limit Plaintiff to only changing positions for one minute every twenty minutes and the "at will" language is superfluous, the ALJ does not explain how Plaintiff can "remain on task," another element of the RFC, while changing positions. The vocational expert identified sedentary "production jobs" that require the use of both hands. The vocational expert also testified that for there to be no more than a thirty-percent decrease in available jobs, Plaintiff would have to be able to stay on task while changing positions for one minute every twenty minutes. It is unclear how Plaintiff is to stay on task in a job that requires the use of both hands while changing to a standing position when he requires the use of his cane while standing.

Finally, the ALJ fails to explain how he determined in the first place that Plaintiff "would not spend more than one minute of every 20 minutes shifting position and will remain on task when shifting." The ALJ identifies no medical evidence, testimony from Plaintiff, or testimony from a fact witness in support of this finding. Thus, the ALJ has failed to build a logical bridge between the evidence and the RFC in this regard. *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (finding that the ALJ did not build a "logical bridge" when she did not identify any medical evidence to substantiate the finding that the plaintiff could stand for six hours in a regular day and lift ten to twenty pounds); *Washington v. Colvin*, No. 12 C 4995, 2013 WL 1903247, at \*11 (N.D. Ill. May 7, 2013) (finding that the ALJ failed to build a logical bridge that the plaintiff's migraines would only result in being off task ten percent of the work day because the ALJ offered no explanation for

the finding and appeared to have adopted the vocational expert's testimony regarding off-task time in the work force).

Accordingly, the Court remands for further proceedings regarding this element of the RFC.

*2.    Physical Impairments*

The ALJ found that Plaintiff is capable of standing or walking six hours in a day. Plaintiff identifies several bases on which the ALJ relied to formulate the exertional limitations of the RFC that Plaintiff asserts are unsupported by the evidence of record. The Court considers each in turn.

First, the ALJ stated that Plaintiff had not undergone knee surgery. However, the record indicates that Plaintiff had left knee surgery in 1983, that he had bilateral leg surgery in 2000, and that a surgical scar was noted on his left knee. The ALJ does not discuss this evidence.

Second, the ALJ stated that Plaintiff's back brace, knee braces, and cane were not "prescribed" by a physician. Although there are no "prescriptions" per se in the record, Plaintiff was given the back brace, knee braces, and cane by his treating physicians. In prison, Dr. Elrod gave Plaintiff a cane and a knee brace. Treating physician Dr. Kadah noted Plaintiff's balance was only fair, prescribed both a back brace and an abdominal binder, and confirmed that Plaintiff required an assistive device for ambulation. The ALJ failed to discuss this evidence from Dr. Elrod and Dr. Kadah. Although the ALJ noted that Plaintiff did not take a cane to the consultative examination and walked with a normal gait, the ALJ failed to note that Plaintiff wore a back brace to that appointment and that he was unable to stoop and squat.

Third, the ALJ stated that "[n]umerous other examinations have revealed that the claimant walks with a normal gait, or that he retains functional abilities that are inconsistent with his allegations." (AR 17). In support, the ALJ cites records at pages 260, 282, 314, and 781; however,

Plaintiff correctly notes that none of these pages indicates a "normal gait." The Commissioner admits as much, (Def. Br. 9), and in an attempt to save the ALJ's analysis, the Commissioner points to the pages that support the ALJ's observation about Plaintiff's normal gait. Yet, the ALJ did not cite those pages. Moreover, the ALJ failed to cite the records that note an *abnormal* gate. *See* (AR 802, 812, 815, 900, 919).

Fourth, the ALJ found that the only physician-imposed imitation is to avoid certain bending positions. However, Dr. Kadah limited Plaintiff to sitting no more than thirty minutes at a time, standing no more than twenty minutes at a time, rarely lifting twenty pounds, only occasionally lifting ten pounds, and sitting and standing or walking no more than a total of less than two hours a day. Moreover, the treatment notes reflect that he reported an inability to perform activities of daily living due to pain. *See* (AR 803) (April 8, 2011).

Fifth, the ALJ relied on Plaintiff's discharge from the pain clinic and the July 14, 2011 report that "he was not currently experiencing pain" as a basis for finding that Plaintiff can sit, stand, and walk for six hours. While there is a notation for "patient pain recorded" of "0" in a July 14, 2011 neurology clinic status evaluation by the nurse for seizures, Plaintiff was not being evaluated for his chronic pain. And, later in the treatment notes by the doctor from the same visit, Plaintiff reported chronic back pain, the doctor noted that the exam of the lower extremities was limited because of lower back pain, and Plaintiff had reduced vibration bilaterally in the ankles and toes. (AR 927). The ALJ did not discuss this favorable evidence.

Plaintiff's suggestion that statements in his discharge note from the pain clinic state that he would require "a higher level of monitoring" is incorrect. Plaintiff was discharged from the pain clinic on June 15, 2011, with the notation that Plaintiff's "condition is stable and . . . his pain

management has been optimized." (AR 890). The notation further provides that Plaintiff was being discharged back to his treating physician's care for ongoing management and medication refills. On June 20, 2011, Plaintiff missed an appointment for individual therapy, and the note for that date mentioned that evaluation scores at in-take suggested that Plaintiff may require a "higher level of monitoring (i.e. smaller prescriptions, more frequent visits, referral to a specialist, etc.)."

The factual errors noted in this section, in combination, make it impossible for the Court to uphold the ALJ's RFC determination, and remand is required for reconsideration of this evidence.

*3.     Mental Impairments*

Plaintiff argues that the RFC fails to reflect impairments resulting from Plaintiff's psychosis, including his hallucinations and his poor insight, poor judgment, and poor impulse control. The ALJ dismissed these impairments on the basis that Plaintiff had not seen "Reggie" in prison, there was no corroboration that Plaintiff experiences hallucinations, the records indicate that Plaintiff does not experience suicidal ideation, and Plaintiff has not been violent since leaving prison.

First, Plaintiff cites no evidence other than his own testimony that he saw "Reggie" in prison. In fact, in a prison treatment record dated July 22, 2009, Plaintiff denied hallucinations or delusions. (AR 256). The ALJ cited a separation notation by Dr. Zhang on the same date that Plaintiff denied hallucinations. *See* (AR 19) (citing Ex. 13F/89); (AR 862). Plaintiff attempts to discredit the ALJ's reliance on Dr. Zhang's notation because it referenced Plaintiff's condition on that date: "He has no [flight] of ideas, no loose association, no auditory or visual hallucinations, no delusions, and no suicidal or homicidal ideation *during the interview today*." Yet, Plaintiff does not acknowledge the other treatment note from that date in which he denied hallucinations, nor does Plaintiff point to any other treatment record from his time in prison in which he reported hallucinations. Nevertheless,

because the Court is remanding for other reasons, on remand, the ALJ shall discuss both treatment notes at pages 256 and 862 of the Administrative Record.

Second, Plaintiff argues that medical records and lay witnesses corroborate his hallucinations. However, the ALJ is correct that the records of Plaintiff reporting hallucinations all began after he was released from prison. On June 11, 2010, the consultative examiner noted that Plaintiff was observed talking to someone who was not present. (AR 347). On May 26, 2010, Plaintiff reported to consultative psychological examiner Dr. Walters that "Reggie," a ghost, had been following him for over twenty years. (AR 344). On July 15, 2010, Plaintiff reported to the social worker at the VA clinic that he could see and talk with his deceased friend "Reggie." (AR 725, 727-28)). On September 13, 2010, Plaintiff reported during treatment at the VA clinic that he had seen his friend "Reggie" and believed that "Reggie" was following him. (AR 713). On October 18, 2010, Dr. Yen noted that Plaintiff reported seeing "Reggie." (AR 854). On March 18, 2011, Plaintiff reported to Dr. Stronczek that he talks with three people that no one else can see. (AR 804-05). On April 25, 2011, Plaintiff reported that he sees "Reggie." (AR 796). On April 27, 2011, Dr. Stronczek noted that Plaintiff continued to talk about "Reggie," "Leroy," and the other person he sees. (AR 794). The ALJ did not err in his analysis of Plaintiff's mental impairments by noting that the reports of hallucinations only became documented after Plaintiff was released from prison.

Third, the ALJ correctly noted that there was no corroboration for Plaintiff's alleged suicide attempt. However, the ALJ's categorical statement that Plaintiff "does not experience suicidal ideation" is not correct. On July 15, 2009, in prison, Plaintiff reported a history of suicidal thoughts. (AR 253, 254). On July 15, 2010, after his release from prison, Plaintiff denied suicidal ideation but reported his attempted suicide ten years earlier. (AR 725). Subsequently, on September 13, 2010,

suicidal ideation was noted. (AR 714). On remand, the ALJ shall consider the evidence of a history of suicidal ideation in the context of the records in which Plaintiff denies suicidal ideation.

Similarly, the ALJ incorrectly stated that there is no record of Plaintiff being involved in violent behavior after the date of his incarceration for battery. (AR 19). In prison, Plaintiff was noted as being argumentative and abusive during a visit for follow up on physical health concerns. (AR 272). Plaintiff testified that, one week before the hearing, he beat up the mailman for asking stupid questions. (AR 63-64). On September 13, 2010, homicidal ideation was noted. (AR 714). Although Plaintiff points to a treatment note on July 15, 2009, that Plaintiff reported a history of homicidal thoughts, he fails to note that he also reported that he never had any intention or plans to follow through on those thoughts. (AR 253). On April 27, 2011, Plaintiff reported, in the presence of his girlfriend, that he had beaten up his sister's boyfriend recently because the boyfriend had beaten his sister. (AR 794). The ALJ shall discuss these reports of violent behavior in his decision.

Finally, Plaintiff notes that his treating psychiatrists repeatedly noted poor insight, poor judgment, and poor impulse control. *See* (AR 714, 728, 797, 808, 842). The ALJ did not discuss these clinical findings. On remand, the ALJ shall incorporate a discussion of this evidence in the mental RFC assessment.

### B. Weight Given to Treating Physician Opinion

An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

28

20 C.F.R. § 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf*, 602 F.3d at 875.

The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. § 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875; *Skarbek*, 390 F.3d at 503.

Plaintiff argues that the ALJ erred in his assessment of the opinions offered by Dr. Kadah, Plaintiff's treating physician, because the ALJ gave neither controlling weight nor great weight to Dr. Kadah's opinion that Plaintiff's osteoarthris, chronic back pain, seizures, and depression prevent

him from sitting more than thirty minutes at a time, standing more than twenty minutes at a time, and sitting more than a total of four hours in a day.

The Court finds that the ALJ erred by giving "little weight" to Dr. Kadah's opinion on the basis that the opinions are inconsistent with the record. The ALJ provides no explanation for why the physical restrictions imposed by Dr. Kadah are inconsistent with Plaintiff's degenerative back and knee conditions, both of which require the use of a brace and a cane. Dr. Kadah saw Plaintiff on a bi-monthly basis, for half an hour to an hour. Yet, the ALJ ignores Dr. Kadah's opinion that Plaintiff requires "very frequent" unscheduled breaks to relieve spine pain and that he must be in a supine position at least 25% of the time. Although the Commissioner's brief cites treatment records that support the ALJ's decision, there is no citation by the ALJ to any treatment records in the portion of his decision weighing Dr. Kadah's opinion. On remand, the ALJ shall properly weigh Dr. Kadah's opinion in light of the treating relationship and fully discuss the evidence in the treatment records.

As for Plaintiff's mental condition, the ALJ found that Dr. Kadah is "unfamiliar with the claimant's psychological condition" because Dr. Kadah opined on the Lumbar Spine Medical Source Statement that Plaintiff is incapable of "even 'low stress' work" because of "his schizo affective disorder per psychiatry." (AR 20) (citing AR 921). The ALJ also discredited the opinion because it appeared prepared for the disability hearing and not in the normal course of treatment. However, Dr. Kadah had Plaintiff evaluated for post traumatic stress disorder and depression in June 2010, referred Plaintiff for counseling, and reviewed the medical record and discussed it with Plaintiff's various other providers. *See* (AR 365, 375, 377, 397, 719). Moreover, the question was asked of Dr. Kadah in the context of providing a medical opinion on the Lumbar Spine Medical Source Statement

form and, thus, should be considered in that context and not as if it were being given as an opinion on mental residual functional capacity. The ALJ is directed to discuss Dr. Kadah's opinion in this context.

Plaintiff also argues that the ALJ's analysis of the consultative psychological opinions of Dr. Johnson and Dr. Pressner is so vague as to be meaningless: " . . . has mental limitations, but can still perform work." (AR 20). On remand, the ALJ is directed to provide a more thorough and example-based examination of these opinions.

## C. Credibility

In making a disability determination, social security regulations provide that the Commissioner must consider a claimant's statements about his symptoms, such as pain, and how the claimant's symptoms affect his daily life and ability to work. *See* 20 C.F.R. § 416.929(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. In determining whether statements of pain contribute to a finding of disability, the regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id*.

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;

(5)      Treatment, other than medication, for relief of pain or other symptoms;

(6)      Other measures taken to relieve pain or other symptoms;

(7)      Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. § 416.929(c)(3). In making a credibility determination, Social Security Ruling 96-7p provides that the ALJ must consider the record as a whole, including objective medical evidence, the claimant's statement about symptoms, any statements or other information provided by treating or examining physicians and other persons about the conditions and how the conditions affect the claimant, and any other relevant evidence. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* § 416.929(c)(1).

An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states he is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on his ability to work "may not be disregarded solely because they are not substantiated by objective evidence." SSR 96-7p at *6. "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

Because the Court is remanding for further proceedings on the basis of the RFC determination, the Court directs the ALJ on remand to discuss the following evidence in determining Plaintiff's credibility.

1.     The ALJ is directed to include discussion of the following evidence when considering Plaintiff's activities of daily living:

    a.     Plaintiff testified that he cannot go to the grocery store because he would "get into it" with people;

    b.     Plaintiff can only shop for five minutes, accompanied by his sister or his girlfriend;

    c.     Plaintiff's need to clean his room arises from his obsessive need for organization, which his psychotherapist remarked is part of his symptom complex;

    d.     Plaintiff's sister helps him to dress by color-coding his clothes, and Plaintiff's girlfriend shaves him and cooks for him;

    e.     as to whether the testimony that Plaintiff cannot use a checkbook is "dubious," evidence from Plaintiff's sister and housemate that he does not know how to use a checkbook or savings account and cannot stay within a budget and how the fact that he was in the military or has a GED means that he can successfully use a checkbook.

2.     The ALJ is directed to explain why Plaintiff's testimony that he becomes irritated with people and wants to assault them is "dubious" (AR 14), explain what weight the ALJ is giving these statements, and discuss the following evidence:

    a.     Plaintiff does not go out unaccompanied;

    b.     Plaintiff's girlfriend accompanied him to the hearing not for social purposes or for enjoyment but to keep him calm;

    c.     Plaintiff was not comfortable attending psychotherapy without his girlfriend;

    d.     Plaintiff did not go out alone because "he had a bad attitude" (AR 181-82);

e.   Dr. Stronczek noted that Plaintiff "seems to be functioning because he mostly stays home and his girlfriend cares for him" (AR 794).

3.   In discussing the credibility of Plaintiff's testimony about his seizures, the ALJ is directed to discuss:

   a.   in finding Plaintiff's testimony about his seizures "not entirely credible" because Plaintiff  "described a hand cramp as a seizure, indicating the claimant either does not know what a seizure is, or is grossly exaggerating his symptoms" (AR 19), the fact that Plaintiff in fact reported that his hand was "seized" when it was cramping;

   b.   Plaintiff's description of his seizures with his eyes rolling back, his body locking up, and losing consciousness (AR 57);

   c.   the fact that Plaintiff gave a similar description to his neurologist (AR 898);

   d.   whether the ALJ disbelieved the testimony about the frequency of the seizures or the testimony about the severity of the seizures.

4.   In discussing Plaintiff's credibility regarding his mental limitations, the ALJ will:

   a.   clarify whether he disbelieves that Plaintiff has hallucinations or whether he believes that the hallucinations are not limiting;

   b.   discuss in more detail the prison records regarding Plaintiff's treatment for mental illness and clarify that there is no record evidence of hallucinations while in prison, including the fact that, on July 22, 2009, Plaintiff denied hallucinations or delusions (AR 256), other than his own current testimony;

c.      discuss the fact that Plaintiff reports having a different number of children at different times and that Plaintiff describes the charges for which he was in prison differently on occasion in the context of his mental condition;

d.      explore whether Plaintiff intended to testify that he could only sit for thirty "seconds" without back pain and discuss that testimony in the context of the treating physician's opinion that he could sit for only thirty minutes at a time.

### D.  Request for an Award of Benefits

Finally, Plaintiff asks that the Commissioner's decision be reversed and remanded for an award of benefits. An award of benefits, however, is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Briscoe*, 425 F.3d at 356)). This is not one of those rare situations. Although Plaintiff requests an award of benefits, Plaintiff fails to present an argument in favor of doing so. The unresolved issues that exist can only be resolved through further proceedings on remand. Accordingly, this matter is remanded for further proceedings.

### CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Memorandum in Support of His Motion for Summary Judgment [DE 16], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order. The Court **DENIES** Plaintiff's request to award benefits.

So ORDERED this 19th day of August, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record